in his official capacity as Secretary of Health and Human Services, head of the Novartis Pharmaceuticals Corporation, Ms. Stetson, for the appellate, Mr. Lendman, for the interviewer's comments. Ms. Stetson Good morning, Your Honors, and may it please the Court. My name is Kate Stetson. I represent the appellant, Novartis. Generic drugs must be the same as the innovator drugs they follow. The same means identical. Everything from their labeling to their active ingredients with limited exceptions. Close enough is not enough. This appeal involves a generic drug application where FDA, in its eagerness to approve a generic, settled for close enough. Those shortcuts it took resulted in the approval of a drug that does not have the same active ingredients, does not have the same label, and does not even have the same dosing regimen. So to start with that last issue, the dosing regimen, in order for a generic to carve out part of a label, FDA must find that such differences, and this is the quote, do not render the proposed drug product less safe or effective than the listed drug. And that requirement has teeth, as we explained in our brief. You can see at Joint Appendix 386 to 389, examples of circumstances where FDA concluded that it was not possible to approve an ANDA because the modified dosing regimen or similar regimen could not be carved out, lest it render the proposed drug less safe or effective. There is a modified dosing regimen on the Entresto label that is protected by a patent. And FDA concluded, regardless, and you can find this in Joint Appendix 354 to 357. This is all of the FDA's response, six paragraphs. FDA concluded that it was appropriate to carve out the modified dosing regimen, which pertains to vulnerable patient populations who are so-called naive to certain types of drugs or have taken low doses of those drugs, that it was okay to carve out that dosing regimen because, this is Joint Appendix 354, the warnings and precautions section, Section 5 of the labeling, are sufficient to mitigate the risk of Entresto's important adverse reactions. So just to pause on that for a minute, if you turn to Joint Appendix 44, you'll find the warnings and precautions section of Entresto's label. Joint Appendix 44. If angioedema occurs, discontinue Entresto immediately. Monitor for airway compromise. If the larynx swells, this could be fatal, so take measures necessary to ensure maintenance of an airway. Remember, this is a pill taken at home. So these measures that FDA is talking about, that it concluded render the generic product no less safe or effective, are after-the-fact measures designed to take into account an adverse reaction that's already happened. But, of course, that's not the standard. The standard that FDA needed to find is, is this generic product no less safe or effective without this information than with it? And I think the pivot to Section 5 is a real tell. Now, what you find elsewhere at Joint Appendix 354 to 357 is what I believe to be a bit of a sideshow, which is about the strength of the underlying data supporting the inclusion of the modified dosing regimen in the first place. There's a lot of discussion about how the study wasn't very robust. It didn't really show very much. That, of course, I think is problematic for a couple different reasons. The first is it's all after-the-fact conversation by a different branch of FDA about something that another branch of FDA concluded 10 years earlier. And if you look at FDA's statements from 2015 to 2024, you find a regular drumbeat of support for the idea that this was important to be on the label. Whether it was the safest is not the question. But if you look, and I'll just read you a series of sites, this is from the clinical review back in 2014, Joint Appendix 615, more patients who were naive to those sorts of therapies or on low doses were able to achieve and maintain the target dose of Emtresto when up titrated over that longer period of time, six weeks versus three weeks. That's Joint Appendix 615. That's sealed Volume 3. Joint Appendix 619, we believe the key risks... Are these FDA findings that you're reading here or from a presentation study? These are FDA findings, yes. We believe the key risks of hypotension and so forth can be adequately managed through clinical monitoring and dose titration. That's 619. You can find similar statements, I won't read them all, on 621, 623, 626, 627. And finally... There is dose titration on the MSN label, correct? There is a recommendation in Section 5 of dose titration on the MSN label, but I think there are a couple problems with that. The first is... Sorry, I'm looking at J67, and it has starting, second, final dosages, titration doses on there. So, right? So, it's titrated too. It's titrated for other circumstances. It does not say, and it can't say, for people who are ARB or ACE naive or have taken low doses of those, titrate in this certain way. I think there are other examples. Can't say that because that's your patented titration thing? I'm sorry? Because that's your patented titration thing? Because that's the patent, exactly. It does have titration, so the issue isn't titration. Well, the issue is titration with respect to those vulnerable populations, Judge Millett. The fact that there is titration recommended in other circumstances I don't think answers this question, and I don't even hear FDA making that argument. The fact that a practitioner might up-titrate for certain other circumstances doesn't mean that you can take out this information from the generic label and declare it to be no less safe or effective, which is, when you pause to think about that language, a very rigorous standard. What FDA appears to be saying here is we don't know that it's the safest to up-titrate in this particular way. Therefore, we can comfortably conclude that it's no less safe if we take it off. Well, it's not just that, because they also concluded from the original titration study that there were other patients. I mean, one, it was a very, very small population that was studied and had other factors that made it a not-so-reliable study. I mean, it could be helpful or informative, but didn't have sort of controlling reliability in that way. And they did have patients who were not being titrated in the same way and found no material difference in results. Well, I think, Judge Millett, that may be... I mean, am I describing it accurately? I think you're describing it accurately to the extent that you've described it. But the other thing in the study, among other things, that I read to you, is more patients who were naive to those therapies were able to stay with and achieve the target dose by being up-titrated more slowly. And that actually squares with something that FDA even acknowledged in its citizen physician response. I mean, this is pretty narrow, scientifically-focused arguments here that you wanted us to say, is that, well, they didn't quite analyze the evidence from the study this way when they read it that way. And it just feels to me that that's a hard row for us to hoe as specialists here, as non-specialists here. At least me, very non-specialist here. Not specialists in this area. Yes, all of us aren't. But it's actually not narrow or scientific at all. It's a question about what the regulation required. FDA must find that this generic with the carve-out is no less safe for effect. And they made that finding. They made that finding. And they made that finding based on the fact that there were the whole titration regime had been studied. And what they essentially concluded in 2015 was, fine to do it. Maybe it helps a little bit or not. But it's fine. It's not harmful. If you want to do it, do it. But other people without titration, they're doing just fine. And we have some titration here. And so what you want us to do is sort of like get into the weeds and say, well, you didn't titrate exactly the same way for this particular group of folks. And, again, that just feels like not in our wheelhouse. No, I actually don't. What I suggested is that all of this discussion about the titration study is a bit of a sideshow because that is not the job of a generic approval. The job of a generic approval is to say, is this thing the same? Not to go back and look at why something was put on the label in the first place. All of this is a discussion that could have happened in 2014 about why this modified dosing regimen should go on the label. But it's on the label. And once it's on the label, in order to take it off, the FDA needed to conclude that it was no less safe and effective. And that's why I keep pointing to the because clause. The only why, and I think this is a good question to ask FDA counsel, why was it no less safe and effective? And the only because is Joint Appendix 354. The omission would not render these drugs less safe or effective because Section 5 takes care of it. All of that stuff about the titration study is just designed to try to minimize the titration study, which puts something on the label in the first place. And I don't think it is a logical flow to say the study was not robust. It showed certain things. It showed that people tolerated this drug better over a longer period of time. But it wasn't sufficiently robust. Therefore, we can't show that it was the safest. Therefore, we can't conclude that it's no less safe. Therefore, it's no less safe. That's the logical line that they're asking you to pursue. And that simply doesn't hold up. That's not a matter of science. That's a matter of freshman year logic. It's a matter of the agency's reasoning. They make the necessary finding. Would not render the drug less safe or effective. And then part of the explanation why is that the benefits of the alternative dose, as reflected in the titration study, are pretty equivocal, pretty minimal, like not worth a huge amount. And, I mean, it makes it a little bit odd that they approved it on the front end. It seems to me like it's not necessarily unreasonable for them to say the basic dosing is safe and effective. There's one study that doesn't really move the needle much one way or another, so we don't really care. It's safe. There's no reason to think it's different. It's safe. We approve it. And now on the back end, they're looking back at it and saying no less safe. Those two things are consistent. And it seems like your line of attack goes more to saying maybe they shouldn't have approved it on the front end. Judge Katsas, I don't think those two are the same at all. And I think even the way that you were describing it kind of shows the flaw in FDA's reasoning. The front end and the back end. The front end and the back end. I mean, what you're basically saying is. But that helps FDA. It does not. What you're basically saying is. On the front end, they say. It's safe.  This may help because people tolerate it better. Therefore, we believe that this is appropriate from a safety perspective. You would have to. They say because people tolerate it better? Yes. Because it appears that some people in this group did, but others who didn't have the titration did fine, too. Well, now we're really getting into the science, though. Right, Judge Muller? No, I'm just reporting what that is. I don't know how it happened. I don't know the chemistry of it. But there was a control group that wasn't titrated, and they did just as well. What FDA said at the time, not in 2024 when it was looking to approve the generic, but in 2014, 2015, more patients who were naive to these previous therapies were able to achieve and maintain the target dose when up titrated over that longer period of time. We believe the key risks can be managed through monitoring and dose titration. A longer titration period may reduce the risk of these key adverse effects. And that goes to Judge Katsas' point, though, right? Because all of this is saying, well, if the evidence is equivocal, maybe it shouldn't have gone on the label in the first place. But it is on the label. And once it is on the label, it is not enough to say, well, it was safe, maybe safer, because it was on the label. So now we can conclude that it is no less safe. Those are the three words they need to conclude. And that you can't do by saying, but the study was not really robust, and it showed that certain people didn't really have an effect, and certain people did. All of that is the quintessential kind of post hoc equivocation. This was on the label. You have to start from that premise. Suppose they thought on the front end that the alternative dosage was equally safe as the approved one. They could have approved that on the front end because it is safe. And they could have approved this on the back end because not approving it doesn't make it less safe. It is just a wash. I think, Judge Katsas, the critical word in your question is suppose. Suppose they concluded that it was just as safe without. We don't know that. We have FDA telling us 10 years after the fact that the study really wasn't worth much. But the fact on the ground that we all need to start with is that this was on the label. And it was on the label because of all of those sites. We're reviewing this order which says it's okay to take it off. Yes. And I think the question for the court is. Not whether it was okay 10 years ago to put it on. Right. It's okay to take it off because we, the FDA, conclude this is no less safe or effective. It is no less safe or effective because Section 5 does all the work for it. That is the problem. All of the talk about how good the study was, how bad the study was, is just, I think, kind of accessorizing what FDA's actual conclusion was. So in order to find that this drug was no less safe or effective, you have to accept FDA's representation that those treatments for adverse effects, the larynx closing, the high blood pressure, the renal failure, after the fact are all sufficient. Now, I know my time is up. I'd be happy to address either of the other two issues. I have at least one question on this topic.  Should we be worried that if we agree with you here, it will provide a disincentive to the FDA next time they're deciding about whether to put something on the label, on the front end? I don't think so. In part because, as I understand the makeup of FDA, these are different groups doing different jobs. The group that is doing the front end job is deciding whether something should go on the label, whether it shows that there may be some upside, that these groups of patients did benefit from a slower regimen. The group of people who are deciding whether to approve a generic are looking essentially for one thing. Is this the same? Is it the same active ingredient, same labeling, same dosage regimen, except for these limited exceptions? So I don't think that this conversation about whether FDA hit its regulatory mark here is going to impact the office of CDER, the new drug approval, in the first place. I think that if something belongs on a label, they will conclude it should go on a label. And if it's on the label, then the generic drug office needs to conclude that it is no less safe or effective for it to be off. So I don't see those two happening. I think that's responsive. Let me give a hypothetical, but I think your answer may be the same answer. You know, now it's 2026, the year 2026, and that first office you mentioned, is it called CDER? Yes. Okay. CDERs, they're deciding what to do with a very inconclusive study. It wasn't designed brilliantly. It doesn't show a lot, but they think, you know, it couldn't hurt to put this titration warning on the label. Might not help, but we're certain it wouldn't hurt. So when the costs are zero, it's an easy decision to make, even if the benefits are minimal. But if they know that down the road, putting that, making that decision, is going to keep generic drugs off the market, which will mean fewer people can access this medicine because not as many people will be able to afford it, now you've really raised the cost of putting that warning, that titration information, on the original label. And so they might say, okay, well, originally there was no cost, minimal benefits, let's put it on. But now we know they're quite significant costs, still minimal benefits, so we'll just keep it off in the first place. I think my answer is the same. But the reason it's the same is because I think the solution to that is for FDA to amend the regulation. If it wants to create kind of a broader aperture for approval of a generic drug product, it could attempt to amend the regulation. I think it would run into the statute at that point. Why would CDER not think? And what I described, are they not allowed to think in those cost-benefit terms? Do you know, I don't know that CDER would consider it to be its job to think about those policy-type costs down the road. I think what CDER, I mean, none of us can really channel, but what CDER would likely say is our job is to approve this drug and this label if we conclude the drug product hits certain marks. If the label really were, like, can't hurt to put it on, and there's no showing of any benefit, I'd venture that it probably wouldn't go on the label. I mean, you know, anything could go on the label. This went on the label because the people whose job it was to approve the label concluded that there was something worth putting on the label. And in that instance, I think it's not appropriate to ascribe to CDER some forward-looking, generic-facing, 10-years-down-the-road problem with what it might be approving. I have a question about a different topic. Just a follow-up on that real quick, if that's okay. How does this labeling process work? Does the company, Interesto here, first propose a label? It does. It does, right. So Interesto here, I assume, proposed a label with this titration process on it, correct? It does, yes.  So, I mean, this titration issue that you're talking about here wasn't something the FDA came up with itself. It was Interesto proposed it, and it looked and said, I'm sure they're looking for all kinds of accuracy and stuff on these labels, and they said on titration, they said we obviously got to make sure nothing on the label makes it less safe. And so, Dr. Dzwajic was suggesting it looked, and they said, you know, a spoonful of sugar makes the medicine go down, fine, you can have it on there, it's not going to make it less safe. Right? Right? Is that right? They approve it because you proposed it, and your proposal, you know, was consistent with keeping, was consistent with a safe way of administering the drug. I don't think that's the standard at the time, Judge Millett, and I certainly don't think that's what they came up with.  What is their test? So you come in with your label, it has this titration, let's assume everything else has been signed off on. What is their test for whether that should, that titration regime should be on the label? Does this label, does this dosing regimen represent a drug that is safe and effective for its intended use? Okay. Right. So it's safe. Is it safe and effective? Right. Yes, but. Your titration thing is not unsafe. See, I think there's a lot of mischief in saying not unsafe, because I think what FDA actually said. It's not the same thing as saying it's safer. I mean, your argument seems to be that it is safer with that titration regime, but that is not, you all proposed the titration, not them. They didn't make an independent finding that this has to be on there. It's required to be on there to make the drug safe. You all proposed it, and they said it is safe with that titration regime. Isn't that what they did? A couple of responses. The short answer is no. It's not what they did. The two responses are, first, there's no hierarchy with which I'm familiar between putting something on the label because it's super, super safe and because it's somewhat safe. What FDA actually concluded, Joint Appendix 623, we agree from the proposed titration strategy from a safety perspective. Joint Appendix 627, the titration study was relatively small, but supports the proposed scheme. Patients who are naive to ACE inhibitors or ARBs on low doses should use a lower starting dose. Joint Appendix 621. That just means titration, right? So it's safe. Yes. It's safe. But they didn't say this is the only way to make it. They found, here's what you guys want to put on there. We've looked at it. It's safe. Your titration regime is safe. That's what it sounds to me like you just said, what I said. I mean, it's either safe or not safe, and they found it was safe. Well, I think the reason I'm hesitating, Judge Millett, is because we don't need to characterize how exactly FDA found it to go on the label. What we need to do is figure out whether FDA correctly found that it could take it off. And that is subject. No, but your argument is it was on the label. Yes. And so taking it off necessarily makes it less safe. And I don't think that's true. I think they could look at your proposed label, look at your titration information, and go, it's safe. And someone could come along with another label for a generic and say, here's what we're doing, and here's our titration approach, and they could look at that and say, that's safe, too. You're kind of dividing the world into sort of this sort of in route. It's all or nothing. It's either safe or unsafe, and I don't understand why they couldn't both be safe and the finding that your label was safe that you proposed with your titration regime necessarily means that any other label that doesn't have that won't be safe, will be less safe. There's two different strands, I think, of your question. One of them is Novartis certainly argued that taking this off the label would make it less safe. So that's certainly true. They may have argued that, but that's not what the FDA found. One thing at a time. Yes. Am I accurate in that? FDA did not find that? FDA did not find that. And the sole issue here is not sort of what Novartis thought, though. It's what FDA concluded, because FDA had to conclude that taking it off would make it no less safe. Not safe, not safe-ish, not safe as long as we can cure somebody's airway closing after the fact. No less safe, and that is the problem. The problem is because FDA had to hit that very high mark, which is understandable, because we're talking about approval of a generic drug that has to be the same. Once it's on the label, that analysis changes. We can talk for a long time about why it went on the label, how strong it was, who got a benefit and who didn't. But once it's on the label, what FDA has to conclude when the Office of Generic Drugs picks up the pen is, is this the same? Can I take this off without- No, is it less safe? Is it no less safe? Yes. Are these things- I'm sorry, I don't know the difference between less safe and no less safe, but I'll take your formulation if you want. No less safe. And so they found that here, and they gave a reasoned explanation for it. I think that's where you and I differ, Judge Millett, because they certainly found it here. And the sole issue on this is, was the explanation reasoned? Was the explanation reasoned when they say it would not render these drugs less safe or effective because Section 5 is sufficient to mitigate the risk? That is the conclusion. That is the only because that they offer. And again, not to beat the dead horse, but all of this discussion about how strong or weak the titration study was in 2014 is beside the point because, Judge Millett, as you pointed out, this is on the label. And because it's on the label, that's the because that they have to establish. Why is it no less safe or effective? Because Section 5 does all the work. Because after the fact, curing of adverse reactions and stopping somebody from taking this drug or re-lowering their dose at that point does all the work. That can't possibly be correct. Right. But if we read the label as having titration up front? Well, I think this is an FDA argument that because the label references clinical judgment and titration, there's really no harm, no foul in taking this specific titration method for people who are naive to certain types of drugs that expand your blood vessels, that a doctor could look at that and say, I'm going to take this a little bit more slowly. Did they find that your titration regime precluded these other health risks? No. No. So either way, there are these risks of things that will happen when they take the pill at home of hypotension, renal issues, other things. These risks are going to happen with either label. They are going to happen less with the slow-up titration label. That was the point of it. So now what we're all the way down to here is a scientific judgment whether those side effects, and they're not dealing with the complete same population that you all are for your drug. So they're doing a subset. And as for that group, we have to say they wrongly found that there would be an equivalent risk of side effects on the titration regime on the MSN label. No. Because unless they find, unless there's evidence that there will be more frequent for the population the MSN drug is serving, more frequent of those dangerous side effects that are hard to deal with at home on the titration regime that's on the MSN label than on your label, unless they make that factual scientific finding, then they're correct. I think they have to make the exact opposite factual finding, Judge Millett. They have to conclude, it's their burden, to show that this is no less safe or effective. So what they would have to conclude is there will be no more adverse effects. Nobody being taken off this drug prematurely because their larynx started to close or their blood pressure spiked or they had a renal failure, that would be no less safe or effective. But not one person without that particular modified dosing regimen would suffer an adverse effect. That's the evidentiary standard. Not our burden, theirs, and they have to show no less safe or effective. And it is for one person is the test? No less safe or effective. For one person? I shouldn't think if you have sort of a super vulnerable one, but I don't think that's a proper addition. If they came in with new evidence, and one of the remarkable things here, of course, is there's no new evidence. Counsel for the government conceded below that this is the same record they were working with in 2014. But if the agency were to come in hypothetically and say, look, we've looked at this and we've, you know, studied the evidence, and we think that, you know, out of 10,000 people taking this drug, one person without this warning might suffer an adverse reaction, then we could have an interesting conversation about whether that was supported by substantial evidence. That was not their conclusion. Their conclusion was we think this is no less safe or effective because you can figure out the risks after the fact. That cannot be correct. But the dosages and warnings that were on there, the dosages include titration. You've got to be fair to what they're saying. The dosages and warnings that are on there, I mean, this is another thing that FDA says that is kind of interesting, that they say, well, there's references to up-titration in Section 5. One of the things they say is if you have an instance where somebody starts swelling up or has a high blood pressure, you can titrate, you know, drop the dose and titrate it from there. But FDA's own regulations say that any dose modification, this is 21 CFR, 201.57C3, dosing regimens must not be implied or suggested in other sections of the labeling if not included in Section 2. So that is the issue I think FDA is confronting. They are trying so hard to get it generic on the market that they are basically passing this off to the warnings and contraindications section rather than putting this where it belongs because they can't find on this record that it can be taken off the label without rendering this no less safe or effective. Now, this does not leave either FDA or the generic in a bad spot. You know, Judge Walker, you asked about possible adverse impacts down the road. FDA can change its regulation. The generic also had a choice here. The generic applicant could have done what about another dozen applicants have done and filed a Paragraph 4 certification to the patents that we're talking about and duped it out in patent litigation. But these folks decided they wanted to try to carve a bunch of things out, including the indication section that we haven't talked about, and try to jump the line to get in front first. That works if FDA hits its marks. And neither on the dosing regimen nor on the indication section did it do what the statute and the regulations instructed to do. I know I've overstated my welcome. I think, Judge Walker, you had another question. This was a question about the active ingredients argument, so I think totally different. Why is your kind of complex versus separate salts notion different than the analogy I'll give you? Can you tell me why it's different? The active sweetener in a sugar cube is not the same as the active sweetener in granular sugar because sugar cubes are cubes and granular sugar is granular. And that seems like a very poor distinction to be making. I'm sure you can tell me why that's not a good analogy for your argument. I think it's not a good analogy because we have to drop that analogy into kind of FDA world. And what FDA world tells us is that active ingredient means same drug substance, same chemical form. And the complex of which Entresto is composed is not the same chemical form as the mixture of which MSN is generic is composed, just as the artificial sweetener is not the same chemical form as a cube made up of granules. So it sounds like it might actually be a very, very accurate analogy, and your argument is in FDA world the difference between sugar cubes and granular sugar does matter. It matters. It matters, yes. Any other questions? I just had one other quick question with this ongoing patent litigation, I guess, in Delaware. There is, yes. And is there any chance that that litigation is going to affect whether this remains a live appeal? I don't think it affects whether this remains a live appeal because the patent litigation has to do with the applicability of a particular couple patents that I don't think are squarely at issue here. This case, of course, involves – But if they were to – if that – it's against MSN. I know, like, the pediatric applications are going on there, I believe, at least part of it. If that court were to decide that MSN can't go on the market because of patent issues, wouldn't this all become a moot question here? I don't think so. The patent, if I remember correctly, that's at issue in the Delaware litigation has to do with – it's combinations of Secubitril and Valsartan. That – if the court were to conclude that the patent is valid and, you know, has a particular patent life, the issue here is whether MSN should have been approved at all because it doesn't – it's not susceptible to having those carve-outs that we're talking about or the two active ingredients. I understand, but would it be able to go on the market at all? No. The point here is, you know, can it go on the market? You have issues about whether it should be allowed to go onto the market, whether it should have been approved under this exception for different indications or carving out indications. But if – all I'm asking – I'm trying to ask a simple question, but maybe I'm failing in doing so, and that is if MSN is found to have violated patents on this drug Entresto in Delaware, would that not keep them off the market regardless of how we answer the questions here? I don't think it would. I'm happy to send a follow-up letter if it would be helpful just laying out the current state of play. But I think it would not because one is an issue of timing and the other is the issue of whether this should have been approved in the first place. Whether MSN should have been approved. That's my point. If they decide it shouldn't have been approved in the first place for a different reason, it would root out these issues. I mean, you all stopped the litigation here in this district court to wait for what's going on in Delaware, which suggests that there is some relationship. There is some relationship between the current district court litigation and the Delaware litigation. Yes. But shouldn't have been approved in the first place is different from can't be marketed until the patent runs out. I think that's the problem. One is timing. One is whether it should have been approved in the first place. But I'm very happy to follow up with the letter just so you've got it in front of you. Okay. Are there no further questions? Thank you very much. Thank you, Ron. Good morning, and may it please the Court. Caroline Tan for the government. Congress wanted to make it easier for affordable, lifesaving drugs to enter the market. Pursuant to that scheme, FDA approved a generic version of Entresto that lawfully carved out patent-protected portions of the labeling. FDA also applied its scientific expertise to determine that the active ingredients for the two drugs are the same. The district court upheld FDA's approval in a thorough opinion. This Court should affirm that decision. I want to start first with the 2.6 dosage labeling. I think the critical point to realize in assessing this issue is that FDA had to answer two different questions in deciding whether to approve the 2.6 labeling in the first place and then in deciding whether carving out that labeling, whether or not that would render the generic drug less safe or effective. Can you just speak up a bit? I'm having trouble. Yes. Yes, Your Honor. In 2015, when FDA had to decide whether to approve the labeling in the first place, FDA only had to ask whether or not the drug was safe with the labeling, not whether that particular, specific, quantitative dosage mechanism made the drug more safe or was necessary to maintain a particular level of safety. That comes with the statute. You would decide it's the only safe way? No, just deciding whether the drug is safe with this labeling. That was part of FDA's overall review of the new drug application, which included that 2.6 labeling. If FDA in 2015 believed everything they've said here about just how weak and equivocal and flimsy the titration study is, it seems odd. Would they have approved the alternative dosage? It seems odd. The question before FDA in 2015 was whether the drug as a whole was safe. That 2.6 labeling was included as part of the new drug application package, and so FDA was assessing the application as a whole. And at the time, FDA had determined that the titration study, which underlies this particular dosage mechanism, may demonstrate nevertheless made the drug safe but never said that that particular regimen made the drug more safe. And, you know, I'm happy to talk about more specifics about that. That regime made it safe, or it was safe with that regime? It was safe with that regime. Because that's different than that regime made it safe. I only meant in considering the application of that particular study. But, yes, the question is whether or not the drug was safe with that regime. The question in 2024, however, when FDA was deciding whether or not the carve-out made the drug less safe or effective, is a different question. The question at that point is whether or not, you know, it requires the FDA to consider this particular regimen in isolation and to evaluate whether or not it was less safe or effective, even if you carved that regimen out. And at that point, FDA concluded that the carve-out did not render the generic drug less safe or effective, in part because the underlying study that supported the regimen never demonstrated that this particular dosage regimen was necessary to maintain a particular level of safety or made the drug safer. I'm happy to talk about the study in more specifics. What about they talk about certain patients who, naive or certain conditions or whatever, for whom the slower titration did seem to work better? Right. So one of the reasons that FDA determined that the carve-out was okay in this instance is that the underlying titration study already evaluated people who had demonstrated some level of tolerability to Entresto, and so it wasn't a population that was necessarily ARB slash ACE inhibitor naive, which was the particular population that the dosage mechanism was referring to. FDA also said, you know, at JA355, that it is unknown whether initiation using this dosage regimen would lead to a meaningful difference in adverse side effects, including hypotension, impaired renal function, and hyperkalemia, and that because there was no evidence supporting the idea that this particular dosage mechanism was necessary to maintain a certain level of safety, carving it out was fine. It would not render the generic less safe or effective. I also want to flag that FDA made this decision in light of well-known medical, background medical guidance in which dose reduction is a known mitigation strategy. So it's not as if so in either world there is an understanding that medical providers recommend dose mitigation for these types of patients. That was a reason to finding, and, you know, the question really here just comes down to whether or not FDA applied its own regulation as to a technical determination that is within FDA's expertise, and I think the record more than adequately meets that standard. I'm also happy to talk about any of the other issues if this Court would find it helpful, but otherwise I think that FDA's determination on the carve-outs as to the indication use and the labeling here adequately meets more than meets FDA standard and the active ingredient issue is clearly the type of scientific determination that's within the agency's expertise. Is the generic here or post-crystal? I'm not. The generic is, I mean, I don't think that the, okay, two responses, Your Honor. The first is that that amounts to a physical distinction and there's no dispute here. I understand they don't. At some point I got confused and I thought there was an illusion that it could also be considered a co-crystal. I'm just trying to clarify that. I think the answer is no, Your Honor, but I don't think it matters because the regulations refer only to chemical identity and not physical form, and the plain face of both drugs labeling make it clear that they're composed of the same atoms, the same molecules. Back on the labeling thing, I mean, the explanation is that the titration study showed that the titrating regime might be safer, at least for the naive patients. So did FDA have to do something more at this stage to decide that, in fact, it's not safer? Why is deciding something might be safer and then going, this one's safe without it? I mean, it just feels like there's sort of a gap there without having made an affirmative determination that, in fact, they're not safer with it. That's how you would decide that the MSN drug is equally safe, no less safe. So I think the answer is because there are two different standards that FDA has to apply in evaluating what it did in 2015 and what it did in 2024. And when it approved the drug application in the first place in 2015, the question under the Federal Food, Drug, and Cosmetic Act, this is in 21 U.S.C. 355D2, is whether or not the drug is unsafe for use, whether or not the results of a test show that the drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions. And so when translated to plain English, that means whether or not the drug is safe with the 2.6 labeling. That's a different question. And at that point, in 2015, FDA said, yes, there might be some... It might be safer, at least for this subgroup of naive patients. Well, FDA did not... I'm just trying to figure out how, when you have at least that might be safer, you can decide that something that doesn't have that is equivalently safe without answering that question as to whether, in fact, it was safer. Am I making any sense? There might be a something. Yes. Only in as much as it explains why FDA approved the new drug application with that labeling in the first place. But at no point did FDA say that that particular dosage regimen made the drug safer. It just said the drug was safe with that regimen. It said it might be safer. So I think you're referring to JA355, where FDA... Yeah. Is that right? Yes. The bottom paragraph there. Yes. As discussed above, titration was a supportive phase 2 trial. It suggested that certain patients might benefit from a slow up-titration regime with a low starter dose. Right. Might benefit. So is that... That seems... It might be safer. Is that wrong? Am I reading that wrong? Some patients might benefit. It might be safer for those patients. No. I mean, the question is... So I don't want to divorce, I think, this isolated sentence from the regulatory standard that FDA had to apply. The question that FDA answered in 2015 was whether the drug is safe with the regimen. And FDA said the drug is safe in part. I understand that. But now or later, and they have to make sure there's an equivalent level of safety. It can't be any less safe. So I'm calling that equivalent safety.  Equivalent or better, I suppose. Whether it's necessary. Yes. Right. No less than equivalently safe. And I guess I'm going to try it one more time. If they say there was some evidence that it might be safer, at least for this one group, to have this titration regime. And now it's 10 years later, and you want to go, we don't need that. Don't you need to eliminate that possibility that it might have been safer? Well, FDA actually determined that it was not... That there were no meaningful differences in adverse side effects between these two sets of populations. So when... I think when we talk about safety, Novartis refers to that in terms of the side effects. Hypotension, hyperkalemia, and impaired renal function. And FDA actually determined, just in the sentence before the one that we were talking about, notably the rates of hypotension, renal dysfunction, and hyperkalemia observed in titration were similar between the two groups. Except the next sentence, might benefit from a slow titration regime, blah, blah, blah, to reduce the risk of adverse reactions such as hypotension, da, da, da, da, da. Right. And therefore, the drug was safe with the proposed dosage regimen that Novartis had suggested be included as part of the interest of the labeling. But that is a separate question, once again, from the question in 2024 about whether or not omitting the regimen. Would it be okay to think about what they did in 2015 as saying, it might be safer, we know that we don't know whether it will be safer? The test is whether, I mean, going back to the statute is whether or not the drug is safe with that labeling. And so I'm not sure if I can say that it would be okay if FDA said we don't know. But that's not what FDA said here. FDA said it's safe with the labeling in part because of these potential benefits. They knew that it was safe to put the drug on the market. I get that. And then they added this thing about the dosing regimen. And they said this particular warning, this particular dosing regimen might benefit some people. And I'm wondering if they could have believed everything they believed at the time and instead issued a statement saying we know that we don't know whether the dosing regimen will benefit anyone. It might benefit some, but it might not. It's something we don't know. So there's two responses, Your Honor. The first is FDA considered the dosing regimen as part of the overall new drug application process. And so it wasn't this two-step thing where they said, oh, the drug is safe and, oh, let's look at this regimen separately. That was part of the overall drug application. And FDA made this determination in light of the understanding that doctors know to use dose reduction as a mitigation strategy, regardless of whether or not this 2.6 labeling is there or not. It's well-known background medical guidance that doctors who are treating heart failure patients might introduce patients who are new to a new kind of drug more slowly. I just want to make sure you haven't talked me out of agreeing with you. So they could have said in 2015, we know that this modified dosing regimen will make people safer. They could have said that, right? And they didn't say that.  And the fact that they didn't say that means instead of saying we know that this will benefit people, the implication of not saying that is we don't know if this will benefit people. Maybe, maybe not. I think that is a fair way to read what happens. I am just somewhat focused on this particular test that applies, but I think that that is a fair way. And it's certainly true that both positions in 2015 and 2024 are entirely consistent with one another. Do you have a response on the implications of the patent litigation? Give us a feel. So I would defer to the private parties on the impact of the patent litigation. The government is not a party to those. It involves a patent, not an issue here. So we defer on the relevance of that particular litigation. Thank you. Thank you, counsel. We'll hear from counsel for MSN now. Good morning. May it please the court, Chad Lambin from Pulsinelli on behalf of the MSN intervenors. So starting with where we left off on the dose titration, counsel for Novartis argued and agreed that really what this issue comes down to is did FDA make a reasoned decision. This is not about the legal standard. This is whether FDA made a reasoned decision. And here the administrative record can't be any clearer. There are over 300 pages dedicated to FDA's analysis of this issue. Not only do they review the titration study, and that's at Joint Appendix 263 to 272, FDA reviewed hundreds of pages of additional scientific articles. We can see those at Joint Appendix 263 to 894, 895 to 931, and 494 to 519. They also had multiple internal consults with physicians and scientists within FDA and then issued a 45-page decision in the citizen's petition. This is the epitome of an agency making reasonable decision-making, and this is a highly technical issue of safety. Under the law, this court should defer to FDA's decision there. I did want to hit a couple of the particular points that were addressed in the discussion that the court just had with counsel for FDA regarding Joint Appendix at page 356 about the language about might benefit. So there was a discussion over the language about might benefit, and I want to point the court to the next sentence that follows there. FDA then goes on to say, therefore, while titration supports the dosing recommendation in Section 2.6 for ACE and ARB-naive low-dose patients, and this is the key and I'll quote, it does not provide a scientific basis to conclude that the standard dosing regimen puts patients at greater risk of adverse reactions. And that's the key here. FDA evaluated the study, evaluated at the time whether removing it would create a label that was less safe, and said it wouldn't. And also FDA discussed again on Joint Appendix 356, looked at the data that counsel for Novartis was talking about regarding dose titration and tolerance, and what FDA said is the P values in that data didn't support any conclusions. And again, from a scientific perspective, that's important, because what P values relate to is whether something is meaningful, whether it has statistical scientific evidence, and FDA concluded that it didn't. And again, this Court should defer to FDA's scientific decision on that issue. If we were just looking at this decision in a vacuum, suppose I agree with you, but to what extent do we have to evaluate the FDA's current explanation in light of what it said and did when it approved the label, the original label? Does that create a Fox versus FCC kind of change of position situation where they have to openly acknowledge and justify a change? Do we need to look at that? I don't believe it does, Your Honor, because there were two different analyses going on. When they approved the label, entrusted the label with the dose titration, they were looking at the label as a whole and saying, does the label as a whole render the product safe and effective, and concluded, yes, the label and the administration according to the label would be safe and effective. The primary and the alternative were approved at the same time? Yeah, yeah, exactly, the dosing rate, exactly. So then now jump ahead to 2024 when they're deciding, do I approve this generic? And the standard is we've been talking about is, would the label be less safe or effective? And that's a different standard FDA is looking at, a different lens it's looking at it through. And that's why it's not contradictory to first include the language in the label and then later say removing it doesn't cause any sorts of issues. I just wanted to touch on briefly, there were a couple of questions on the same active ingredient that came up. First, Judge Millett, you had a question about whether the MSN product was a co-crystal. FDA has determined that it is a co-crystal, and I'll point the court to Joint Appendix 813. FDA does an analysis there. Also Joint Appendix 817 where FDA actually looks at X-ray diffraction data, again a highly scientific analysis, but determines that the MSN and a product is a co-crystal. Judge Walker, you also had an analogy, I thought it was an interesting analogy of cubes versus granular and whether that makes a difference. Not addressing necessarily the way Novartis is counseling into your question, but the key is for FDA's purposes, it's whether the ingredients are chemically the same, not their physical form. FDA has been clear, and Novartis doesn't challenge, that you can have different what we call polymer forms, which is a different physical form of an active ingredient. In fact, you'll see throughout the record references to the polymer form that MSN has. I believe under your analogy, the granular sugar and the sugar cubes, if they're just stuck together in a different form, then they are the same active ingredient. Really, the active ingredient analysis here should begin with the label and how FDA describes both products. FDA describes both products, both Entresto and MSN's generic product. They describe the active ingredient as being anionic forms of sagubitril and balsarin in sodium cations in the molar ratio of 1 to 1 to 3. Now again, highly scientific and complicated, but what FDA is saying there is these are the exact same chemical compositions that are in these products. Again, that's sufficient for FDA making its determination. Again, it's a highly scientific determination. There are hundreds of papers. What's the language in either the statute or the regulation that I can go to and I read this and I say, Okay, in FDA world, we actually do treat cubed sugar and granular sugar the same. So there's a guidance, a polymorph. So backing up, the statute talks about the active ingredients being the same. Obviously, Congress has kind of looked at FDA to kind of define that more further. There's then an FDA guidance on polymorphism where FDA discusses what polymorphs are and that you can have a different polymorph form. I don't have the citation off the top of my head, but we can certainly submit it later if that would help the court. Is it in the brief? It should. Yes, yes. No, there's a discussion in the brief about that.  Isn't it in the regulatory definitions of active moiety and salt? It's laid out there. There is as well. Thank you, Your Honor. Yeah, in the regulations, they define the active ingredient by the active moiety and including its salt. So not only the active moiety, but the salt forms need to be the same, which, again, FDA did a thorough analysis, spent hundreds of pages in the administrative record going through this to make the scientific conclusion. Unless the court has any other questions, I want to thank the court for its time and urge the court to affirm the district court's decision. Thank you, counsel. Ms. Stetson, I think we used up all your time, but we will give you two minutes for rebuttal. Thank you, Your Honors. Judge Kansas, I want to start with your question about the Fox v. FCC issue because as I listened to counsel's arguments, it struck me that there's really two levels of post hoc discussion going on. One of them is actually the classic Bowen v. Georgetown Hospital, which is what you did not hear from either of my friends on the other side is any reference to the actual because reason that was in FDA's citizen petition response. This is no less safe or effective because Section 5 takes care of everything. That was the conclusion, and you did not hear one word about Section 5 today. What instead you heard was discussion about, again, the titration study. But that gets to your question, I think, Judge, about the nature of the analysis that's going on 10 years after the fact compared to what was actually going on at the time. So you heard a lot of quotes from Joint Appendix 355 and 354 and 356, all of which I encourage you to read, all six paragraphs of the reasoning, not 300 pages, six paragraphs. But if you go back to the actual Joint Appendix pages where FDA decides and makes its clinical and pharmacological review of this label, Joint Appendix 615, 619, 621, 623, 626, 627, what you will find there is many different versions of this might help people who are ARB or ACE naive. Sorry, what's on those pages? I have the key for the labeling issue we've been discussing is roughly 353 to 356. That is the citizen petition response. That's the 2024 citizen petition response. What I'm talking about is the 2014 actual... Oh, the original, the reasoning. Exactly, the original review. And what's the page range? Sorry, give me the page range again. Sure, 615 to 627. And on each of those you'll find actually Judge Millett and Judge Walker some version of what you said, which is we agree that these key risks can be managed through clinical monitoring and dose titration, 619. We agree with the titration strategy from the safety perspective, 623. 627, patients who are naive should use a low starting dose. Mandatory language, by the way, not a recommendation. Well, you do on this label. My son's label has a lower starting dose, too. And what you don't have, and that's what was on 356, is them just flatly rejecting the argument that it's a scientific matter. Your interest dose titration regime is necessary for safety. I know my time is up, Judge Millett, but if I could just respond to that quickly. If you look at that paragraph on 356, which I encourage you to, FDA is essentially setting up the straw man of what Novartis argued. Novartis argued that the modified dosing regimen was the safest and best tolerated regimen. That's Novartis' argument. What FDA chose to do, rather than answer the question, is it no less safe without it, was to say, as a scientific matter, we can't conclude that it's the safest and best tolerated. And, Judge Walker, that leaves me in the end to your question. No, they go more than that. They say it doesn't provide a scientific basis for including the, I'm leaving a few words out here, the entresto dosing regimen, or not having it, puts patients at any greater risk. It does not provide a scientific basis to conclude, as you assert in your petition, that the standard entresto dosing regimen puts such patients at a greater risk. Right, or it's critical to ensuring safe and effective use. And that is a logical lapse to say that because we can't conclude that it puts patients at a greater risk, we can conclude that it puts patients at no greater risk. That gets to your kind of Brunsfeldian known unknown question, right? If we don't know, if FDA approving this drug didn't know in 2015, did this create less risk or not, we're going to put this on because all indications from that page range I showed you show that there are certain folks who benefit from that slower titration regimen. They can stay on there longer. No, they might. They might. They might. They might not. They might not. Might means might, might not. But that's the problem for FDA, right? Because in order for FDA to conclude that it's no less safe. Because there's no evidence. And that's FDA's problem. That that titration regime, that that titration regime, that hewing to that titration regime is necessary to ensure equivalent safety. That is emphatically FDA's problem and not ours, Judge Millett. And then the fact that there are separate findings that individuals on that titration study who had a different titration regime did just as well. Yes. And you heard all that from FDA counsel as well. But what I didn't hear was an answer to your question. What I think you said is might be is something. And it doesn't get you to the conclusion that it had to make, which is this is no less safe. If we don't know whether this is safer, that doesn't mean that we can conclude it's no less safe. That's the logical problem with what FDA is setting up here. So might is a word we use in opinions all the time when we don't want to say whether we know something or not. Right. And it may be because an opinion is being joined by different members of the panel who don't agree. And so what you say is this argument might succeed if, you know. And that means might succeed means might not succeed. And might or might not means unknown. I think, Judge Walker, we're reducing the FDA's actual analysis in 2014 down to maybe below its common denominator, might. What FDA said, remember at Joint Appendix 315, more patients were able to achieve and maintain the target dose. We believe the key risks can be managed through monitoring and dose titration. A longer titration period, we agree from a safety perspective. Patients who are naive should use a lower starting dose. There's no might to any of those at all. You said might benefit. There's a different might benefit, yes. But the ones that I just read to you are. But should start at a lower dosage doesn't mean should start at your lower dosage. And they do on the MSN label start at lower dosage. They have a titration regime. Let me read the entire quote then. Joint Appendix 627, the titration study was relatively small but supports the proposed dose titration scheme. Patients who are naive to ACE inhibitors, ARBs, or on low doses should use a lower starting dose. Not a lower starting dose. Not that lower starting dose. On the MSN label, they have a lower starting dose. Do they not? Not for patients who are ARB naive. That is nowhere on the label, including in Section 5. That's generic, the starting dose. It's not qualified, is it? But this is the close enough problem, I think, Judge Millett. No, no, no, no, no, no. It's not. Where does it say titration step doses? Where does it say but not for those folks? I don't think it needs to say but not for those folks. Okay, so for everybody, the starting dose is lower than the second dose, which is lower than the final dose. For everybody. So you're thinking that they should have a lower starting dose is fully satisfied on this label. No, I don't think it is, Judge Millett. I think we might be talking about two different things. What the lower starting dose was that was directed, not recommended but directed in the Entresto label, is that you have the starting dose when you're working with a population that is vulnerable to ACE or ARB drugs. That's the distinction. I don't think it's an answer to say there's a reference to up titration elsewhere in the label. Okay. Any other questions? There are no further questions. Thank you. Thank you very much, counsel. The case is submitted.
judges: Millett; Katsas; Walker